Filed 9/19/14  P. v. McWaters CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROY LEWIS McWATERS,<br><br>    Defendant and Appellant. | F066589<br><br>(Super. Ct. No. CRM013312)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Kendall Simsarian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Chung Mi (Alexa) Choi for Appellant and Respondent.

-ooOoo-

Defendant Roy Lewis McWaters, a homeless man living in Atwater, was convicted of stalking a grocery store clerk.  McWaters had a previous conviction of stalking.  He argues that there was insufficient evidence to prove the offense; that the court gave the jury an erroneous instruction on the purposes for which it could consider evidence of his

prior stalking conduct; and that the court improperly relieved the prosecution of the burden of proving intent by instructing the jury that motive was not an element of the crime. We affirm.

### *FACTS AND PROCEDURAL HISTORY*

McWaters was arrested at the Food-4-Less supermarket in Atwater on October 11, 2010. Store staff had called the police after McWaters had come into the store four times that night to approach the check stand of the victim, Denise Z. When Denise retreated to the office at the back of the store, McWaters followed her and glared at the mirrored glass window of the office after she entered. As will be seen, this was the last of numerous incidents of harassment of Denise by McWaters at Denise's workplace and home, occurring over several months.

The district attorney filed an information charging McWaters with one count of stalking after having been previously convicted of stalking. (Pen. Code, § 646.9, subd. (c)(2).)[1] The information alleged that McWaters was previously convicted of stalking on June 10, 2003 and January 24, 2006. For purposes of sentence enhancement under section 667.5, subdivision (b), the information alleged that McWaters served a prison term for the 2006 conviction.

At trial, Denise testified that she first saw McWaters in June or July 2010. He was a homeless man who bought food in the early morning, between 6:00 and 7:00 a.m., at Food-4-Less. He tried to flirt with Denise, continuing to talk after his transaction was complete and making her uncomfortable. He always came to Denise's register to pay for his items, even if other cashiers had shorter lines. He came through her line many times during her shift. He stared at her for hours. This went on for months.

Denise first saw McWaters in front of her home, an apartment a few blocks from the store, on August 12, 2010. She was outside the building with her son when McWaters

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

approached on a bicycle and offered her a soda. Denise grabbed her son and declined the soda. She waited for McWaters to leave before going inside because she did not want him to see which apartment was hers. She feared he would hurt her and felt defenseless. She did not know how McWaters found out where she lived.

The next day, August 13, 2010, Denise found a Food-4-Less bag outside her apartment, containing flowers, toys, and necklaces. There was a note in the bag written on a Food-4-Less receipt, saying, "Denise, I'm sorry. I love you." The receipt was for cans of tuna, and the name of the cashier was printed on it. Denise learned from that cashier that McWaters had bought some cans of tuna.

One day later, August 14, 2010, Denise came home from work and found more necklaces, like the ones left the day before, a few feet from her apartment door. McWaters rode by on his bike a few minutes later and Denise asked if he left the necklaces. McWaters denied, then admitted, that he did. Denise instructed him not to come to her home, not to leave things for her, and to leave her alone. McWaters agreed, but reappeared by 6:00 p.m. the same day.

After a week or two, items began to appear again at Denise's home. McWaters left them in the middle of the night. Denise found letters, cards, flowers, necklaces, balloons, toys, and coloring books. Sometimes the items were in bags, other times scattered around. Necklaces were sometimes placed in tree branches at Denise's building. One item McWaters left was a cell phone. Trying to determine if it belonged to a neighbor, Denise examined some of the phone's contents and realized it came from McWaters. She found text messages on the phone stating that McWaters loved and missed Denise and was sorry. The phone also had explicit photos on it, showing penises, vaginas, women's breasts, and "[g]irls with girls." Denise threw the phone away, fearing that McWaters would use it to call her. She also feared he would sexually assault her. She put all the other items he left in the garbage where he would see them, so he would

3.

know she did not want them. He continued leaving them. He rode his bike by Denise's apartment and stared every day.

McWaters continued to make appearances at Denise's work as well. If Denise changed registers when McWaters entered her line, McWaters followed her to the new register. Denise asked assistant manager Brian White for help. White told McWaters he was disrupting Denise's work and could not go through her line any more. McWaters agreed, but came to Denise's line again the next day. Denise called White, and McWaters retreated to another line. He glared at Denise in a manner she found threatening. McWaters continued coming to Denise's line. He would move to another line when he saw White coming toward him. White confronted McWaters and told him to leave the store. McWaters said he was "not stalking anybody" and was doing nothing wrong. White told McWaters he had seen him on the security video constantly entering Denise's line. McWaters continued coming to the store and going to Denise's register.

McWaters left items for Denise at Food-4-Less every day. Her coworkers told her he came at 3:00 or 4:00 a.m. to leave them. He left balloons, flowers, candy, and a ring. He left a card saying, "To my little rain drop. I love you." McWaters examined the employees' work schedules, which were posted in the break area, until White moved them.

Denise was frightened and frustrated. She was afraid to leave home alone and did not want to go to work. She varied her route to work to avoid McWaters. She would make a pass by her building before returning home after work, to make sure McWaters was not waiting for her. She began keeping all the windows and doors closed at home. She feared McWaters would kidnap her son. She and her mother, who lived with her, avoided going outside.

Denise sought help from the police in September 2010. An officer came to her apartment and she reported what had been happening. The officer said the police could do nothing unless she directly witnessed McWaters leaving items at her apartment.

On the day McWaters was arrested, October 11, 2010, Denise had to leave her register repeatedly to avoid McWaters. He glared at her as she walked away. A manager called the police only after McWaters had re-entered the store several times without buying anything and appeared a final time in the parking lot. McWaters told an officer, "She was the only register open. That bitch is freaking out." Denise shook and cried as she described McWaters's behavior to a detective.

Two victims of similar stalking behavior by McWaters, Elizabeth V. and Silvia S., also testified.

Silvia worked at McDonald's in Atwater in 2005 when McWaters began coming in the restaurant and staring at her. The McDonald's was located in the same parking lot as the Food-4-Less. He continued doing this for years. He left things at her car and house, including condoms and lubricants, as well as a bed sheet, earrings, bottles of soda, statues of fairies, dead butterflies in a plastic container, and letters. One letter said McWaters was divorced and had not had sex in five years. In 2008 or 2009, Silvia moved to a different apartment and McWaters began leaving things at her new home. In 2009, Silvia contacted police, and an officer asked McWaters to leave her alone. He continued. Silvia's boyfriend told McWaters to stop in 2010, but still he continued. Finally, Silvia obtained a restraining order against McWaters.

Elizabeth worked at McDonald's in Atwater in 2002, when she was 20. For two years, McWaters came to the restaurant often and stared at her while standing in her line or sitting at a table. Elizabeth had to ask her supervisors to move her from the cash register to the back of the restaurant when McWaters came in. For a period of six months, McWaters left items every day or two for Elizabeth on her car and at her apartment building. These included notes, cards, flowers, a toy car, a rosary, and a baseball bat. The bat had a yellow bandana with a rock inside tied to the handle. On one occasion, Elizabeth entered her apartment to retrieve something, and when she emerged again five minutes later, McWaters had left a rose on the doorstep.

5.

Incoherent notes McWaters left for Elizabeth contained cryptic references to love, someone getting hurt, and time running out. One note read:

"Rocks pass metal detector, aim accurate can cause damage. Gay may be funny now until accident happens. Bad day hurt, these, lost trust, then company error, lost product. Oops, punched wrong key, extra to hurt to get mad. Time again stops. Do I now go onto the next serious? I look for friend, look me not money, love isn't time. If you must buy it. Specially you have enough to get whatever your heart desire, time shall only making matters worse. I tried only to get crushed all day."

The back of the same note said, "yes, Angel, thought it was you on highway, extra red," and "Truth may hurt, but reality is worse." Another note said:

"I opened this card and instantly your face came out. Sorry, I got hurt too. Looking at these cards brings back those hurts. Blame Judge, DA, [investigator] would be more aggressive had I not done time for something I didn't do. Now to see all this hurt directly related only brings rage out. Now they want to continue crush on me, makes matters worse. Seems matters only grows worse. All I know I ain't seen anything getting better. I'm only getting more mad with the passing of every week. Drag feet, don't deny with me, no longer, times up."

Elizabeth felt threatened by McWaters's notes and behavior and feared for her safety. She feared McWaters would hurt her daughter. She carried mace and ran from her car to her apartment.

McWaters testified in his own defense. He said he lived in a shanty and went to Food-4-Less early each morning after collecting recyclables during the night. He said his intention toward Denise was to ask her out and he never meant to scare her. He admitted he left items for her. He admitted he left her a cell phone, but denied that it had any photographs on it. He also admitted that Denise told him to stop leaving things for her and that he continued doing so in spite of this. He conceded that White told him to stop going through Denise's line. He claimed he did not always go through Denise's line and that he went there on the night of his arrest because it was the only line open. McWaters admitted he left items for Elizabeth and Silvia, but he never meant to scare them.

6.

The jury found McWaters guilty as charged. McWaters admitted he served a prior prison term as alleged in the information. The court sentenced him to the upper term of five years plus one year for the prior prison term, a total sentence of six years.

## DISCUSSION

### I. Sufficiency of evidence

McWaters argues that insufficient evidence was presented at trial to establish the offense of stalking. The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well established:

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] … We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

McWaters was convicted of violating section 646.9, subdivision (c)(2), which prescribes a term of imprisonment of two, three, or five years for a conviction under section 646.9 with a prior conviction under that section. Section 646.9 provides in part:

> "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking .… [¶] … [¶]
>
> "(e) For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. [¶] … [¶]

"(g) For the purposes of this section, 'credible threat' means a verbal or written threat … or a threat implied by a pattern of conduct … made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat.…"

The Court of Appeal has summarized the elements of stalking in the following way:

"The elements of the crime of stalking (§ 646.9) are (1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear of death or great bodily injury." (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210.)

McWaters first argues that the prosecution failed to prove he harassed Denise within the meaning of section 646.9, subdivision (e), because the evidence failed to show that he lacked a legitimate purpose. His legitimate purposes in going to the store and Denise's house and leaving things for her in those places were to shop and "in his own way" to court Denise.

The prosecution presented substantial evidence on the basis of which the jury could reasonably reject these claimed purposes and find that McWaters's purpose was not legitimate. McWaters continued his conduct for months even after Denise and others acting on her behalf made it clear to him that his actions were harmful and unwanted. Legitimate shopping activity does not involve entering the same store and seeking out the same cashier many times per day even after being told to stop. Legitimate courting activity does not involve constantly imposing one's unwanted presence and gifts at another's home and workplace even after being told to stop. The jury reasonably disbelieved McWaters's words regarding his purposes and reasonably drew a contrary inference from his actions.

8.

McWaters cites *People v. Tran* (1996) 47 Cal.App.4th 253, but that case does not help him. Tran, a stalker, wanted his victim to leave her husband, so he threatened her with a knife and a hammer and chased the husband and the couple's child with a knife. (*Id.* at pp. 256- 258) McWaters suggests that a lack of a legitimate purpose could not reasonably be inferred in his own case because his behavior was not so extreme. But *Tran* does not, of course, stand for the proposition that equally extreme behavior is necessary to establish the offense.

McWaters next argues that the evidence did not establish a credible threat within the meaning of section 646.9, subdivision (g), because it was not shown that he had an intent to place Denise in fear for her safety or her family's safety or that his behavior actually caused Denise reasonably to experience that fear.

As section 646.9, subdivision (g) states, the threat element can be established by a "threat implied by a pattern of conduct ...." The jury could reasonably find a threat implied by McWaters's pattern of conduct toward Denise. As we have already noted, McWaters appeared constantly at Denise's home and workplace and constantly left unwanted gifts for her in those places over a period of months in opposition to her express wishes. He left messages claiming to love her although they were strangers. He left a phone with pornographic photos on it, implicitly asserting his sexual interest in her, even though she repeatedly told and showed him his advances were unwelcome. When she rebuffed and avoided him at work, he directed hostile glares at her. He did these things even though he had reason to know, from his prior conviction, that behavior of this kind is unlawful. The jury could reasonably infer that the intent behind this focused, aggressive, and hostile behavior was to cause Denise to fear for her safety. It also could find that the fear she experienced was objectively reasonable.

## II. *Jury instruction on prior conduct*

McWaters contends that the trial court erred when it instructed the jury on the purposes for which it could consider McWaters's prior stalking conduct. The jury instruction stated in part:

> "The People presented evidence that the defendant committed other offenses that were not charged in this case. This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] … [¶]

> "If you decide that the defendant committed the offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

>> "The defendant was the person who committed the offense alleged in this case; and/or

>> "The defendant acted with the intent to place [Denise] in reasonable fear for her safety or for the safety of her immediate family.

> "Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility.

> "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

The argument in McWaters's briefs is that the prior conduct evidence was inadmissible to show identity, i.e., that he was the person who engaged in the currently charged behavior. As McWaters also concedes that identity was not at issue in this case, however, any error in admitting the evidence for this purpose necessarily was harmless under any standard. McWaters further argues that, as there was no need for the prior conduct evidence to prove identity, the prejudicial effect of the evidence substantially outweighed its probative value in establishing identity, so the evidence should have been excluded under Evidence Code section 352. As we explain below, the evidence had strong probative value for proving McWaters's *intent*, and this value was not substantially outweighed by the prejudicial effect.

10.

At oral argument, McWaters's counsel shifted his ground and contended for the first time that the prior conduct evidence was inadmissible to prove *intent* because it was so dissimilar to the current conduct that its prejudicial effect substantially outweighed its probative value. We reject this contention for two reasons. First, counsel's oral development of this argument was brief, included no citation of authority, and incorporated little in the way of factual detail that might have shown how McWaters's stalking of two other female retail clerks at a neighboring business might have been substantially dissimilar from his stalking of Denise. In the briefs, as we have said, the argument is not presented at all. Therefore, we conclude that the argument is forfeited. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.)

Second, the argument is without merit.

> "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent [under Evidence Code section 1101]. [Citation.] '[T]he recurrence of a similar result … tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act ….' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.] [¶] … [¶]

> "Our conclusion that section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because that evidence is relevant to prove a relevant fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.] [¶] … We thus proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of

misleading the jury.'  (Evid. Code, § 352.)"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-404.)

In this case, the close similarity between McWaters's stalking of Silvia and Elizabeth strongly negatived accident, inadvertence, and good faith.  The inference that McWaters harbored the same criminal intent in each instance was well supported.

Further, the probative value of the prior conduct evidence was great.  McWaters had engaged in persistent, long-term harassment of other women in a nearby location in the recent past and had suffered negative consequences for it.  The importance of this for the jury in deciding whether McWaters's intent was criminal or was, as he argued, only to court Denise, was very significant.  The prejudicial impact of the evidence did not substantially outweigh this probative value.

### III.    *Jury instruction on motive*

McWaters maintains that the court improperly removed the issue of intent from the jury's consideration by giving the following standard instruction on motive:

> "The People are not required to prove that the defendant had a motive to commit the crime charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.

> "Having a motive may be a factor tending to show that the defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty."

The court also gave a number of instructions requiring a finding of intent. Explaining the elements of the offense, the court told the jury it was required to find that McWaters "willfully and maliciously harassed or willfully, maliciously, and repeatedly followed another person" and made a credible threat "with the intent to place the other person in reasonable fear for her safety or for the safety of her immediate family."  The court further explained that a person does an act willfully when he does it "willingly or on purpose" and acts maliciously if he "intentionally does a wrongful act" or "acts with the unlawful intent to disturb, annoy, or injure" someone.  In another instruction, the court

12.

stated that the People "must prove not only that the defendant did the acts charged, but also that he acted with a particular intent." Finally, the court instructed that the "crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime in this case, that person must not only intentionally commit the prohibited act, but must do so with a specific intent." McWaters does not question the correctness of these instructions.

The court gave correct instructions on both motive and intent. Intent is an element of stalking and motive is not. McWaters's argument confuses the two.

We rejected an argument similar to McWaters's in *People v. Fuentes* (2009) 171 Cal.App.4th 1133. Fuentes argued that the trial court improperly relieved the prosecution of the burden of proving the intent element of criminal street gang participation (§ 186.22, subds. (a), (b); § 190.2, subd. (a)(22)) by giving a standard jury instruction that there was no need to prove motive. (*Fuentes, supra*, 171 Cal.App.4th at p. 1139.) We stated:

> "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent. We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death. Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so. This was not ambiguous and there is no reason to think the jury could not understand it." (*People v. Fuentes, supra*, 171 Cal.App.4th at pp. 1139-1140.)

The same reasoning applies here. The jury was properly told that, to convict, it needed to find an intent to harass and an intent to cause fear, but did not need to find any motive. The two points were consistent. An intent to harass another and place her in fear is no more a "motive" in legal terms than is any other specific intent.

Like Fuentes, McWaters relies on *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126-1127. *Maurer* does not conflict with what we have said. The Court of Appeal held there that the standard motive instruction was erroneous when given in conjunction with an instruction on section 647.6, which prescribes punishment for "[e]very person who,

13.

motivated by an unnatural or abnormal sexual interest in children, engages in conduct with an adult whom he or she believes to be a child" where the conduct would be an offense if the other person really were a child. Since this offense includes a "motivation" as one of its elements, a jury naturally would be confused by an instruction saying the prosecution need not prove the defendant's motive. There is no similar problem with section 646.9, the stalking offense. That offense does not require proof of motivation by any abnormal sexual interest or any other motivation. It requires proof only of the sort of intent that other specific-intent crimes require.

## ***DISPOSITION***

The judgment is affirmed.

_____
Chittick, J.[*]

WE CONCUR:


_____
Poochigian, Acting P.J.


_____
Franson, J.

---

[*]Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14.